**UNITED STATES of America**

v.

**Rudolph VILHOTTI, Vincent Santa, Albert Mercurio, John Maloney, Alexander DiGiacomo and Anthony DiMenna, Defendants.**

**No. 69 Cr. 560.**

United States District Court, S. D. New York.

Feb. 16, 1971.

Whitney N. Seymour, Jr., U. S. Atty., S.D.N.Y. by William B. Gray, Asst. U. S. Atty., for plaintiff.

Jerome Lewis, New York City, for defendants Rudolph Vilhotti and Vincent Santa.

Evseroff, Newman & Sonenshine, Brooklyn, N. Y., for defendant Albert Mercurio.

H. Elliot Wales, New York City, for defendant Anthony DiMenna.

## OPINION

TYLER, District Judge.

Four of the above-named defendants, Rudolph Vilhotti, Vincent Santa, Albert Mercurio and Anthony DiMenna,[1] moved for an order pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure directing the suppression and return of certain cartons containing sundry drug items, seized without a warrant by a special agent of the Federal Bureau of Investigation, William E. Kelly, on March 27, 1969.

In a three-count indictment, filed July 10, 1969, defendants were charged with conspiracy to violate and violations of 18 U.S.C. § 659, in the purchase, receipt and possession of goods traveling in interstate commerce stolen from two motortrucks operated by Paul's Trucking Company and from the Connecticut ship-

---

1. The court has been informed that defendant Anthony DiMenna died on or about January 27, 1971. However unfortunate, his death does not affect disposition of this motion. See Part II, *infra*.

ping depot of Bitter Freight System, Inc., Gore Division.[2]

The motion was heard by the undersigned on November 18, 1970. The evidence consisted primarily of the testimony of four government witnesses: FBI Special Agent Kelly, William H. Abraham, owner of the garage from which the majority of items were seized, Marion Pignone, co-owner and manager of the store from which the remaining items were seized and Thomas Minor, superintendent of an adjacent apartment building, his testimony offered by stipulation. There follow my findings of fact and conclusions of law.

## FINDINGS OF FACT

A member of the hijacking squad of the Federal Bureau of Investigation, Agent Kelly conducted the investigation which led to the March 27, 1964 arrests and seizures at issue herein. Approximately two months earlier, an unidentified informant, with whom Kelly had dealt for about two years,[3] advised that defendant Vilhotti had been using a certain garage at 356 West 172nd Street in the Bronx as a "drop" for stolen goods and that an old man had been engaged to watch the premises. From checking Vilhotti's record, Kelly learned that the defendant had two prior convictions for similar crimes. Accompanied by two members of the New York City Police Department, Special Agent Kelly conducted surveillance of the 172nd Street garage and observed an old man, whom he later identified as defendant DiMenna, frequently at the garage. It was DiMenna who held the leasehold interest on the property.

Between March 23 and March 26, 1969, Kelly received further information from the same informant which led him to re-institute surveillance of the garage. On Sunday, March 23, the informant advised Kelly that Vilhotti had participated that weekend in the hijacking of two trailer-trucks, one of which could be found in Brooklyn, the other in Queens. The FBI had received a complaint that two trucks containing sundry drugstore items were missing from the Pathmark installation at Cranford, New Jersey. The missing units were found, as the informant had predicted, in Brooklyn and Queens on Monday March 23 and Tuesday March 24, respectively. On Wednesday, the informant communicated to Kelly that the stolen items were in the 172nd Street garage. At 4:00 p. m., Kelly and the same two New York City police officers began the second and final surveillance of the garage. No one was seen at the garage that night.

At approximately 10:00 p. m., Agent Kelly accompanied by the two police officers, approached the rear of the garage through the service alley of an adjacent apartment building. Standing in the service area which abuts on the garage structure,[4] and with the aid of a flashlight, Kelly and at least one of the police officers peered through a small space between the boards covering a rear window. From this vantage point Kelly was able to see approximately 25 feet into the garage where he discerned a number of cartons, several of which bore the marking "SGC" and/or various numbers. A check with the FBI in New Jersey revealed that the letters SGC stood for Supermarkets General Corporation, and the numbers, for Long Island stores to which the goods were consigned, thereby establishing that these boxes were those stolen from the hijacked Pathmark trucks. Kelly thereafter telephoned Assistant United States Attorney Frank Turkheimer, who advised that a search warrant could be obtained and di-

---

2. I note that Count 3 of the indictment charges DiMenna separately with possession of carton containing *inter alia* socket wrenches, suppression of which was not sought in this proceeding.

3. No question concerning the reliability of this informant is raised by the defense.

Prior to the instant arrests, his information had led to the arrests of 13 persons and recovery of more than $250,000 of stolen merchandise.

4. The owner of the garage, Mr. Abraham, testified that the garage structure covers the entire 3500 foot square parcel.

rected Kelly to send someone to his office in the morning to apply for one.

The first activity the agents perceived at the garage on March 27 was the arrival of DiMenna in an old black car at approximately 5:30 a. m. DiMenna made about three trips carrying cartons from the garage to his car. Accompanied by one of the city detectives, Kelly followed DiMenna to the corner of 189th Street and Belmont Avenue, where DiMenna unloaded the cartons and carried them into a candy store at 2481 Belmont Avene. The agents then returned to the garage and Kelly had a second telephone conversation with Turkheimer who advised him of the appropriateness of a warrantless arrest in the event that the warrant, then being prepared, would not be timely obtained.[5]

At 9:20 that morning, three men emerged from a black Chevrolet parked by the corner opposite the garage. Kelly was able to identify two of the three men as the defendants Vilhotti and Santa, as he had previously seen their photographs and checked their criminal records. Of Santa, who had not, like Vilhotti, been specifically implicated in the hijacking by the informant, Kelly knew at least that he had been dismissed from the New York City Police Department in 1961. Mercurio, the third companion, he did not recognize. Vilhotti and Mercurio proceeded to the garage. Santa reparked the car and followed after them.

Several minutes later Kelly and the police officers approached the door of the garage. The door was locked, but while they were standing there, Vilhotti opened it. Kelly arrested him in the small office into which the street door opened. Santa and Mercurio were brought from the back of the garage, containing the cartons, to the office where Kelly advised them they were un-

der arrest. (It is immaterial whether they had been so advised by the officers who retrieved them.) Kelly's arrest of the remaining two defendants, Maloney and DiGiacomo, shortly thereafter, is not in issue here.

That afternoon. Kelly returned to the Belmont Avenue candy store, where he had previously observed DiMenna deposit cartons from the garage. Identifying himself as an FBI agent, he asked the owner, Mrs. Marion Pignone, whether an old man had left some cartons there earlier that day. She identified the old man, defendant DiMenna, as "Cowboy", a frequent visitor to the store and readily pointed to several boxes, which DiMenna had left earlier when only her husband was at the store. At Kelly's request Mrs. Pignone directed him to several additional cartons in the rear of the store. Kelly took the cartons and left. DiMenna was arrested several weeks later.

## CONCLUSIONS OF LAW

Defendants, jointly and severally, make the following arguments for suppression: [6]

—The warehouse arrests lacked probable cause and therefore cannot legitimate the incidental search and seizure.

—A warrantless search is not saved from illegality, even if incidental to a valid arrest, where it was not impracticable to have obtained a search warrant.

—Seizure of the cartons from the candy store was neither incidental to a lawful arrest nor consensual.

For the reasons set forth below, I conclude that the warehouse seizure was properly incidental to the valid albeit warrantless arrests of the three defendants present there, that issuance of a search warrant was both unnecessary

---

5. In fact, as the government concedes, no warrant, either for search or arrest was obtained.

6. The government concedes the standing of the original four defendants to move

for suppression under Rule 41(e). Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

and impracticable, and that the seizure from the candy store was consensual.

## I.

A warrantless arrest by a federal agent is valid so long as he has reasonable grounds to believe a felony is being or has been committed by the person arrested. 18 U.S.C. § 3052. The statutory language is deemed coextensive with the Fourth Amendment's probable cause standard. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Assuming, as will be discussed fully hereinafter, the validity of the arrests of defendants Vilhotti, Santa and Mercurio, admission into evidence of the fruits of a properly incidental search and seizure finds no impediment in the Fourth Amendment.

■■ Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) constricted the proper scope of an incidental search to those items under the immediate control of the person arrested which would either endanger the arresting officer, afford a means of escape, or be subject to imminent destruction. Since the arrests of these defendants predated Chimel, the validity of this incidental search must be assessed in light of the broader standards of United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 544 (1950), and Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969). Those decisions permitted search of the premises within defendant's control, but without limiting the type of items subject to seizure or strictly confining the area of search. The seizure in the case at bar was well within the governing standards. The cartons seized were in plain view of Kelly from his position in the front office. Indeed no "search" in the sense of rummaging in concealed places was conducted.

■ Defendants complain less of the scope of the incidental search than of Kelly's failure to obtain a search warrant after being directed to the Bronx garage in the late afternoon of the preceding day. Again Rabinowitz governs and makes clear that the practicability of obtaining a search warrant is only one of many factors to be considered in evaluating the reasonableness of a warrantless search incident to arrest. United States v. Rabinowitz, supra, 339 U.S. at 65, 70 S.Ct. 430. It was hardly unreasonable for Kelly to commence surveillance of the garage immediately upon receiving the informant's tip, rather than first swearing out a search warrant. The lateness of the hour made it impracticable, if not impossible, to obtain a warrant prior to the arrests early the next morning. Indeed, the warrants in preparation early in the morning of March 27 had not been issued prior to the 9:30 arrests. That Kelly proceeded in utmost good faith, and not in conscious or careless disregard of the constitutional mandates, is evidenced by his frequent checks with the Assistant United States Attorney on duty. Compare Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948).

Although one valid arrest at the garage would justify admission of the incidentally seized cartons against all codefendants (assuming subsequent valid arrests), I find all three arrests supported by the requisite probable cause.

### A. Vilhotti

■ Agent Kelly had overwhelming cause to arrest Vilhotti following the defendant's arrival at the Bronx garage. Kelly had word from a highly reliable informant, whose information regarding this very hijacking had already checked out, that Vilhotti was involved in the hijacking and that he was using the garage as a drop for the stolen goods. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), United States v. Soyka, 394 F.2d 443, 453 (2d Cir. 1968) cert. denied 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969). In addition, Kelly witnessed DiMenna removing cartons from the garage unusual-

ly early in the morning. Thus even without the information, gleaned from the flashlight search of the garage interior, Kelly had legally sufficient grounds to arrest Vilhotti. Cf. Alderman v. United States, 394 U.S. 165, 181, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968), Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Although decision on this Rule 41(e) motion does not turn on the legality of the flashlight inspection, judicial responsibility to delineate the boundaries of permissible law enforcement makes discussion of the constitutional issues raised by the inspection appropriate. Despite the assiduous regard for the law with which Agent Kelly conducted his investigation, the window search of the garage presents a close question under the Fourth Amendment.

■■ The technicalities of the common law of trespass are not dispositive of Fourth Amendment claims. The "open field" or "curtilage" doctrine, which defined an area of constitutionally permissible trespass, represents an early rejection of the notion that the extent of landholding is a reasonable measure of the privacy to which an individual is entitled. See particularly Wattenburg v. United States, 388 F.2d 853 (9th Cir. 1968). Conversely, modern methods of surveillance and the density of urban living necessitate abandonment of the element of physical invasion as a *sine qua non* of a Fourth Amendment violation. Silverman v. United States, 365 U.S. 505, 510, 81 S.Ct. 679, 5 L.Ed.2d 734. These divergent developments are embodied in the teaching of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that the interest protected by the Fourth Amendment is reasonable expectation of privacy. Thus to ascertain what constitutes an unreasonable search the court must evaluate a person's efforts to insure the privacy of an area or activity in view of both contemporary norms of social conduct and the imperatives of a viable democratic society. Katz v. United States, *supra,* see Greenawalt, "Consent Problem in Wiretapping and Eavesdropping", 68 Col.L.Rev. 168 (1968).

■ The two most important variables in deciding whether a visual search contravenes the Fourth Amendment are accessibility to view and the nature of the premises. Thus, for example, "objects falling within the plain view of an officer who has a right to be in the position to have that view" are not constitutionally protected. Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067. While Kelly's vantage point was a well-traveled public right of way, it would be distorting the "plain view" doctrine to hold that it encompasses peering through cracks in a boarded window. Compare Harris v. United States, *supra,* James v. United States, 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969), Ponce v. Craven, 409 F.2d 621 (9th Cir. 1969) cert. denied sub nom. Ponce v. California, 397 U.S. 1012, 90 S.Ct. 1241, 25 L.Ed.2d 424 (1970), United States v. Llanes, 398 F.2d 880 (2d Cir. 1968) cert. denied 393 U.S. 1032, 89 S.Ct. 647, 21 L.Ed.2d 576 (1969), United States v. Lewis, 227 F.Supp. 433 (S.D. N.Y.1964).

■ The photographs submitted in evidence by the government show, however, that the gaps between the boards covering the window were readily apparent to any passerby. The fact that private citizens have peered through these gaps does not necessarily permit a government agent to do the same. Cf. United States v. Averell, 296 F.Supp. 1004 (E.D.N.Y.1969), United States v. Masterson, 251 F.Supp. 937 (S.D.N.Y. 1967) cert. denied 385 U.S. 833, 87 S.Ct. 72, 17 L.Ed.2d 67 (1966). But under Katz, an agent is permitted the same license to intrude as a reasonably respectful citizen would take. Therefore, the nature of the premises inspected— e. g. whether residential, commercial, inhabited or abandoned—is decisive; it determines the extent of social inhibition on natural curiosity and, inversely, the degree of care required to insure privacy.

Here, given that an unattached garage was the object of search, neither social nor physical barriers were sufficient to protect its interior from intrusion by a casual observer. Kelly's flashlight search, therefore, did not encroach upon defendants' reasonable expectations of privacy. Indeed, it is not unlikely that police officers would routinely make such inspections as part of their peacekeeping functions.

In holding the instant window search permissible, I wish to make clear that I do not read See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), which concerned *entries* upon non-public commercial premises, to prohibit all distinction between commercial and residential properties under the Fourth Amendment. To give such effect to dicta in *See* would be singularly incompatible with the rationale and direction of *Katz*. Cf. Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (decided January 12, 1971) (Douglas, J. dissenting).

B. Santa and Mercurio

Defendants Santa and Mercurio urge that since Kelly had no prior information linking them to the crime under investigation, their arrests were based simply on their being in the presence of the suspect Vilhotti. The "mere presence" doctrine seeks to protect persons innocently in the company of a known or suspected criminal. Therefore, some additional circumstance from which it is reasonable to infer knowledge of or participation in criminal enterprise must be shown. In United States v. DiRe, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), where defendant's presence in a car with a known criminal was deemed insufficient cause to arrest, the Court suggested several guides:

> The argument that one who "accompanies a criminal to a crime rendezvous" cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hideout * * * and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. at 593, 68 S.Ct. at 228.

More recently in Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968), the Court invalidated an arrest based solely upon an officer's observation of defendant conversing with several known addicts. Justice Douglas wrote in concurrence:

> Consorting with criminals may in a particular factual setting be a basis for believing that a criminal project is underway. at 68, 88 S.Ct. at 1912.

The circumstances of these arrests certainly support, at the very least, an inference of knowledge on the part of Santa and Mercurio of the criminal enterprise in which Vilhotti was then engaged. Santa and Mercurio were not simply in the presence of a known criminal. They were in the company of a key suspect on highly suspicious premises at a time when illicit dealings, likely to involve a number of persons, were expected. Indeed, they were arrested in plain view of the stolen merchandise sought to be suppressed. While Kelly's knowledge of Santa's past criminal involvement lent further support to his suspicion, the circumstances alone afforded probable cause to arrest. Mercurio's arrest, therefore, was not any less warranted. An officer need not know the identity of a person to have probable cause for arrest. United States v. Llanes, *supra*, 398 F.2d at 883.

II.

Although the argument for suppression of the cartons DiMenna had removed to the Pignones' candy store was made by DiMenna's counsel alone, the three codefendants are deemed to join therein. Since the indictment's accusation of possession encompasses these cartons, as well as those at the warehouse, all defendants have standing to move to

suppress. Jones v. United States, *supra.* DiMenna's intervening death, therefore, does not divest them of the right to assert unlawfulness in a seizure from a codefendant. Cf. Alderman v. United States, *supra,* compare United States v. Cataldo, 433 F.2d 38 (2d Cir. 1970). Notwithstanding some confusion in the record, it is assumed in defendants' favor that these cartons were located partly in the public area of the store and partly in the rear private area.

Inasmuch as Kelly's seizure of the cartons from the candy store was neither pursuant to a warrant nor incidental to an arrest, Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), United States ex rel. Savino v. Follette, 305 F.Supp. 277 (S.D.N.Y.) aff'd 417 F.2d 1070 (2d Cir. 1969), its validity depends upon wheher Mrs. Pignone could in law and did in fact consent.

▮ There is no question but that Mrs. Pignone was legally capable of consenting to seizure of DiMenna's possessions left in her store. He had no agreement with her (or her husband) whereby he had reserved for his exclusive use any part of their premises. Her relationship to the late defendant was comparable neither to that of landlord, nor of hotel manager. Compare respectively, Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) and Stoner v. California, 376 U.S. 483, 84 S. Ct. 889, 11 L.Ed.2d 856 (1963). If Di-Menna had any rights in the premises, it was, at most, as a joint occupant with Mrs. Pignone. Her consent is, therefore, legally operative as a waiver of Fourth Amendment protection. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1969), United States v. Cataldo, *supra.* 8 Moore's Federal Practice—Cipes, Criminal Rules 41.07(4).

▮ To be effective, her consent must be proven by clear and positive evidence to have been voluntary—i. e. unequivocal, specific and intelligently given. United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963). Behavior on the part of law enforcement officials amounting to trickery or force unquestionably renders the consent invalid. Bumper v. North Carolina, *supra,* United States ex rel. Lundergan v. McMann, 417 F.2d 519 (2d Cir. 1969), United States v. Curiale, 414 F.2d 744 (2d Cir.), cert. denied 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 424 (1969), United States v. Gorman, 355 F.2d 151 (2d Cir. 1965), cert. denied 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966), United States v. Como, 340 F.2d 891, 893 (2d Cir. 1965). And, absent such behavior, close scrutiny of the circumstances may reveal more subtle forms of coercion. See cases cited, United States v. Smith, *supra,* 308 F.2d at 663, United States v. Gregory, 204 F.Supp. 884 (S.D. N.Y.), aff'd 309 F.2d 536 (2d Cir. 1962), cert. denied sub nom. Sumpter v. United States, 373 U.S. 953, 83 S.Ct. 1684, 10 L. Ed.2d 707 (1963). But straightforward inquiry by an authority figure such as a law enforcement officer normally does not preclude consent. United States v. Cachoian, 364 F.2d 291, 292 (2d Cir. 1966), cert. denied 385 U.S. 1029, 87 S.Ct. 757, 17 L.Ed.2d 676 (1967), United States v. Gorman, *supra,* 355 F.2d at 159, United States v. Hall, 348 F.2d 837 (2d Cir.), cert. denied 382 U.S. 947, 86 S.Ct. 408, 15 L.Ed.2d 355 (1965). Nor must affirmative desire for search be shown to establish consent. United States v. Thompson, 356 F.2d 216, 220 (2d Cir. 1965), cert. denied 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966).

▮ This case involves neither overt nor subtle coercion. Kelly's conduct was free of deception and intimidation. In response to very specific questions, Mrs. Pignone readily directed him to the cartons in question, much as she might have directed him to an item he wished to purchase. Unaware of the cartons' contents or source, she had no reason to fear reprisal if she failed to cooperate, and sought no benefit from her affirmative cooperation.

A purer case of voluntary consent would be rare indeed. Whether seized from the public or private portion of the

store, these cartons which defendants seek to suppress are admissible.

The motion for suppression and return of cartons of sundry drug items is denied in all respects.

It is so ordered.