Thomas Russell Jones, J.
The defendants have moved to suppress 42,590 packages of untaxed cigarettes which were confiscated by New York State Tax Department agents, without a warrant, on the ground that the officials had no probable cause to believe that a crime was being committed in their presence atlthe time of the seizure.
Defendants also contend that their Fourth Amendment right to be secure against unreasonable search and seizure was violated when the agents entered the garage of the private dwelling, where they were gathered, to seize the contraband cigarettes[1].
The court has reviewed the transcript of the minutes of the suppression hearing, which occupied a full day. Memoranda of law and oral arguments by both sides have likewise been considered. The defendants’ motion is denied.
The facts in this case are uncomplicated. On the morning of April 22, 1973 two investigators attached to the New York State Department of Taxation and Finance[2] took up surveil *289 lance of a house on 50th Street in Brooklyn in order to observe the activities of a man named "Getto”, the defendant Vincent Nastase. The investigators were acting on an explicit tip from a confidential informant that "Getto” was a trafficker in untaxed cigarettes. The informer had alerted the tax department to the fact that "Getto” lived in a specific house on 50th Street and that he often visited his sister at a particular address on 79th Street[3]. At about 7:00 a.m. the investigators observed "Getto”, (who will hereafter be referred to as Nastase), leaving his home on 50th Street. He walked to a luncheonette nearby and went inside. Soon after Nastase left the luncheonette in the company of another male. Both men entered a green Pontiac automobile and drove away, with the agents in close pursuit. The Nastase vehicle meandered about the streets of the neighborhood for a time and finally stopped in front of the house on 79th Street, the very address where the informant said Nastase’s sister lived. The suspects left their vehicle and disappeared from view by walking along a common driveway between two buildings which led to a garage attached to the house. A few minutes later a blue van arrived and backed into the driveway, thereby completely blocking the entrance of the garage. Moments later the tax agents saw a Dodge sedan stop in front of the 79th Street house. Two other men left this last vehicle and entered the garage along the same path recently taken by Nastase and his companion. The investigators then telephoned their headquarters and discovered that the license plate numbers on the Dodge corresponded to the registration on a similar Dodge automobile seized by the Virginia State authorities in 1973 and found to be carrying 14,200 packages of untaxed cigarettes. Both agents thereupon crossed the driveway to the open garage door and looked inside. From this vantage point they observed the three defendants "pushing * * * half cases,” i.e., cartons wrapped in brown paper and sealed with masking tape. The investigators testified, as experts, that they then realized that these defendants were trafficking in untaxed cigarettes. The court has accepted the tax agents’ claim of expertise; that by training and experience they had learned *290 that such wrapping was the typical manner in which contraband cigarettes were usually packaged. Upon seizing the cartons, which were then in "plain view” on the garage floor, the agents confirmed their expert expectations and discovered 4,259 cartons (42,590 packages) of untaxed cigarettes, none of which bore the required purple stamp to indicate that the New York State excise taxes had been paid[4]. The defendants were arrested.
The tax agents were justified in the course they followed and in seizing the contraband cigarettes since they acted on "specific and articulable facts which, along with * * * [their] logical deductions, reasonably prompted that intrusion.” (People v Cantor, 36 NY2d 106,113.) The search in this case meets the standards laid down in People v Malinsky (15 NY2d 86, 91) because it was conducted by officers who " 'had reasonable cause for believing’ ” that a crime was being committed in their presence by the suspects. The reasonable cause had been furnished by the communication they had received from an informer and by "the separate, objective checking of the tale he t[old]” (People v Coffey, 12 NY2d 443, 452, cert. den. 376 US 916). The testimony of the tax investigators as to their observations, taken together and in conjunction with the information they received from a reliable informer, establishes the requisite probable cause (cf. Draper v United States, 358 US 307; People v Marshall, 13 NY2d 28, 33-35; People v Santiago, 13 NY2d 326; People v Gary, 14 NY2d 730, cert den 379 US 937).
The tax department had been tipped off by an unnamed informant that Nastase, nicknamed "Getto,” lived in a house on 50th Street in Brooklyn. The investigators’ independent observations corroborated this tip when they saw the suspect leave the house in the early morning. The tipster reported that Nastase often visited his sister’s house on 79th Street. *291 The tax agents followed him round-about the neighborhood and observed him as he marched straight into his sister’s garage. The informant had told the tax department that a van went into Nastase’s sister’s house. As the tax agents watched, a blue van backed into the driveway of the sister’s home on 79th Street. The informer’s tale was thus reliably established (cf. People v Coffey, supra, p 452). It was also apparent that the tax agents’ independent observations, "the separate, objective checking” (People v Coffey, supra, p 452) turned up evidence which heightened their suspicions that the suspects were trafficking in untaxed cigarettes. The third vehicle to arrive at the scene, a Dodge, bore the same license plate numbers as a Dodge car which had been seized by the Virginia police in 1973 for carrying contraband cigarettes. The tax agents then took the logical next steps which these remarkable circumstances demanded. They moved directly to the threshold of the garage where they could continue their observations. On looking through the open door, the agents clinched suspicions, for there were Nastase and his companions in the act of handling cartons of untaxed cigarettes.
For the purpose of this motion the court has credited the tax agents’ claim of expertise. They have asserted that by training, experience, and knowledge they could recognize the usual method employed by cigarette smugglers to conceal and transport untaxed cigarettes (cf. Dougherty v Milliken, 163 NY 527).
Under the conditions which confronted them: the presence of three motor vehicles, one of which obstructed the open garage door, and the gathering of men strongly suspected of criminal activity, the officers acted swiftly. "The exigencies of the situation made that course imperative” (cf. McDonald v United States, 335 US 451, 456; People v Taggart, 20 NY2d 335, 340; Warden v Hayden, 387 US 294, 298). For when automobiles are used, trial courts have been warned to be aware that law enforcement officers must move speedily to protect themselves from harm and prevent the removal of contraband from their reach. The motor vehicle as an instrument of crime has revolutionized criminal assaults on society in the same fashion as the tank has revolutionized warfare. The United States Supreme Court has therefore declared that the Fourth Amendment safeguards against unreasonable searches must be adjusted to the real world of the swift- *292 moving automobile which moves criminals and contraband at high speeds (Carroll v United States, 267 US 132, 153).
In any event, this court finds that the search in the garage was not unreasonable. On the contrary, the agents’ course of action from the beginning of their surveillance to the seizure and arrest of the defendants was reasonable, appropriate, and effective. Chief Justice Burger, then a Judge of the Circuit Court of Appeals for the District of Columbia, commenting on probable cause, said in Smith v United States (358 F2d 833, 837, cert. den. 386 US 1008): "As we have often observed, probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not the individual layers but the laminated’ total.”
The defendants’ second objection is that the agents invaded their privacy by crossing the driveway leading to the garage; that the officers unlawfully trespassed on the "curtilage” of the house to view the interior of the building, in violation of the Fourth Amendment. "Curtilage” has been defined by the court in United States v Potts (297 F2d 68, 69): "Generally speaking, curtilage has been held to include all buildings in close proximity to a dwelling, which are continually used for carrying on domestic employment; or such place as is necessary and convenient to a dwelling, and is habitually used for family purposes.”
"Curtilage” has no bearing on this case. The Fourth Amendment protects people, not places (Katz v United States, 389 US 347, 351)[5].
In Warden v Hayden (387 US 294), the Supreme Court declared (p 304): "The premise that property interests control the right of the Government to search and seize has been discredited * * * We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts. * * * This shift in emphasis from property to privacy has come about through a subtle interplay of substantive and procedural reform.”
*293 A further refinement of the privacy rather than property objective of the Fourth Amendment is found in Mancusi v DeForte (392 US 364, 368) where the court said: "The Court’s recent decision in Katz v United States, [supra] * * * also makes it clear that capacity to claim the protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion.”
The concept of trespass on the curtilage of the defendant’s premises, i.e., his garage, no longer prevails as the standard to test the Fourth Amendment’s protections. In 1971 the California Court of Appeal, Fourth District, swept away the ancient mystique of "place” as the central theme of the Amendment in People v Maltz (14 Cal App 3d 381, 394-394), when it stated: "In recognition of the proposition that the Fourth Amendment protects persons rather than places (Katz v United States, 389 US 347, 351 * * *), and, perhaps, in recognition of the principle that the conflicting policy considerations involved in Fourth Amendment problems are not to be resolved by reference to technical rules of property (cf. Jones v United States, 362 US 257, 266, * * * Mancusi v DeForte, 392 US 364, 368 * * *), the more recent cases deemphasize the question of trespass and attempt to resolve the reasonableness of the search by asking 'whether the person [the accused] has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion.’ * * * The more recent approach is the more sound. It permits a consideration of the conflicting fundamental policy considerations and relegates the question of trespass to its proper place, that is, the question whether there has been an unreasonable governmental intrusion.” This court considers that the agents’ movement across an open driveway serving adjoining buildings which led to the door of the garage did not encroach unreasonably upon the defendants’ area of expected privacy. Even had the agents’ suspicions not been so flagrantly aroused, it would have been appropriate for them to approach the door of any private building near enough to look inside, without violating constitutional rights. When one’s window is open or the shades left undrawn, or a door left open, a householder expects that someone will look inside, even out of curiosity. The case of United States v Vilhotti (323 F Supp 425, cert den 406 US *294 947) is uniquely like the situation under consideration. In Vilhotti an F.B.I. agent received a tip that the defendant was using a certain garage for storing stolen goods. The agent learned that the defendant had been previously convicted for possession of stolen property. The agent went to the defendant’s premises and approached his garage through a service alley. Standing in the service area which abutted the garage, the officer beamed his flashlight through a space in boards covering the rear window and saw the contraband. The court denied defendant’s motion to suppress the stolen goods, saying (pp 431-432): "Thus to ascertain what constitutes an unreasonable search the court must evaluate a person’s efforts to insure the privacy of an area or activity in view of both contemporary norms of social conduct and the imperatives of a viable democratic society * * * Here, given that an unattached garage was the object of search, neither social nor physical barriers were sufficient to protect its interior from intrusion by a casual observer. Kelly’s [the agent] flashlight search, therefore, did not encroach upon defendants’ reasonable expectations of privacy. Indeed, it is not unlikely that police officers would routinely make such inspections as part of their peacekeeping functions.”
The tax agents did not unreasonably invade the areas where the defendants could logically or legally have expected privacy. Moreover, even if there were such a reasonable expectation of any privacy, under the circumstances the officers’ actions were not unreasonable.
Accordingly, the defendants’ motion is denied in all respects.
The parties are directed to be ready for trial on April 1, 1975.
The Clerk of this court is directed to serve a copy of this decision, together with a copy of the order thereon, upon the District Attorney and upon the defendants’ attorney.

. The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated”.

. Subdivision (a) of section 477 of the Tax Law provides: "(a) Whenever the tax commission or a police officer * * * shall discover any cigarettes, subject to tax * * * *289 and upon which the tax has not been paid or the stamps affixed * * * they are hereby authorized and empowered forthwith to seize and take possession of such cigarettes”.

. The informer’s tip was recorded on a typewritten form in the office of the Special Investigations Bureau, Department of Taxation and Finance.

. New York State Tax Law (§ 471, subd 1) imposes a tax on cigarettes “at the rate of seven and one-half cents for each ten cigarettes or fraction thereof.”
Subdivision a of section D46-2.0 of the Administrative Code of the City of New York imposes a basic tax "of two cents for each ten cigarettes or fraction thereof.” An additional tax is imposed at the rate of "one and one-half cents for each ten cigarettes” or "two cents for each ten cigarettes” depending upon the tar and nicotine contents of the cigarettes.
The State tax per pack of 20 cigarettes is 15 cents. The city tax per pack of 20 cigarettes is either 7 or 8 cents. The total revenue per pack of cigarettes is 22 or 23 cents. Therefore, the total tax due on 42,590 packs of contraband cigarettes is at least $9,369.80.

. Cf. also Terry v Ohio (392 US 1, 9), in which the United States Supreme Court emphasized that "wherever an individual may harbor a reasonable 'expectation of privacy’ * * * he is entitled to be free from unreasonable intrusion * * * 'What the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures’ ” (emphasis added).