**UNITED STATES of America**

v.

**Miguel Angel TABORDA, Defendant.**

**No. 80 Cr 200.**

United States District Court,
E. D. New York.

June 9, 1980.

Edward R. Korman, U. S. Atty., Brooklyn, N.Y. David Eisenberg, Asst. U. S. Atty., Brooklyn, N.Y., of counsel, for United States.

Charles L. Weintraub, New York City, for defendant.

## OPINION

NICKERSON, District Judge.

Defendant was indicted for possession with intent to distribute of 230 grams of

cocaine, in violation of 21 U.S.C. § 841(a)(1). He moves under the Fourth Amendment to suppress evidence seized at Apartment 1G, 139–55 35th Avenue, Flushing, New York (the Apartment), in which he had been living.

The items were seized in the Apartment pursuant to a search warrant, and the issue is whether the magistrate properly issued the warrant. The affidavit submitted to him recited that commencing October 4, 1979, detectives and other agents of the Drug Enforcement Administration conducted surveillance on the Apartment "at times by means of a high-powered telescope (*i. e.* a Monolux # 4352 telescope with a 22mm viewer) located in apartment 3G of 139–50 35th Avenue, Flushing, New York which was directly across the street from" the Apartment.

The affidavit then describes what was seen. At about 8:00 P.M. on October 4, 1979, the detectives observed two males and a female in the kitchen. On a table were some "baggies" and two jars labelled "Inositol", a substance used to dilute cocaine. The males, sitting near the window, were cutting off the ends of some 100 small black objects (about 4 inches tall) and emptying white powder from them into a plastic bag. They touched their faces only with the backs of their hands. Another clear plastic bag containing white powder was on the window sill. Occasionally the males drew their heads back, grimaced and waved their hands before their faces as if to disperse an offensive odor. At about 10:00 P.M. they finished the procedure and washed their hands with a honey-colored liquid. The three then departed, one of the males appearing to carry something inside his jacket.

At about 6:55 P.M. on October 10, 1979 an agent "by the same means described above" saw one of the individuals opening several bags containing white powder, sifting it through a strainer, and then placing it in smaller plastic bags.

On October 23, 1979, at about 4:50 P.M., agents "by the same means described above" observed two of the individuals empty some white powder into a clear plastic bag which they sealed with a tie.

Nowhere does the affidavit state which, if any, of the observations were made with unaided eyes. Nor does the affidavit reveal how distant the agents were from the Apartment.

In order to obtain a full record the court held a hearing at which four members of the New York City Police Department testified. They identified defendant as one of the two males and said, in substance, that with their naked eyes they saw almost everything from some 200 feet away, and that the telescope, although it was in almost constant use, was needed only to read the labels on jars and to count the number of black objects. The court granted the motion, holding that the affidavit was insufficient to support the warrant.

The Fourth Amendment to the United States Constitution reads as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

■ The court may, of course, look only to what was before the magistrate and not to what developed at the hearing. *United States v. Menser*, 360 F.2d 199, 203 (2d Cir. 1966). To do otherwise would make meaningless the requirement that probable cause be shown to a judicial officer before issuance of the warrant. Where information in the affidavit is based entirely on the product of an "unreasonable search" no "probable cause" for issuance is shown. *United States v. Stoner*, 487 F.2d 651, 653 (6th Cir. 1973).

Here, so far as the affidavit reveals, every fact critical to a showing of probable cause might have been observed exclusively through the telescope. This is not a case, such as those cited by the government, where the language of the affidavit is am-

biguous and can be read to support issuance of the warrant. *See, e. g., United States v. Pond*, 523 F.2d 210, 213 (2d Cir. 1975), *cert. denied*, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976). The affidavit says the telescope was used "at times" and sets forth no facts from which one may infer what those "times" were. The court must therefore address the validity under the Fourth Amendment of government use without a warrant of a high powered telescope, a matter which the Supreme Court has not yet considered.

The amendment assures "the people" that they will be secure against official investigative "tactics" which are "unreasonable". *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). "It is thus the arbitrary and unreasonable activities of the police against which the Fourth Amendment protects." *United States v. Iovine*, 444 F.Supp. 1085, 1088 (E.D.N.Y.1978). As long ago as *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), it was said that the amendment protects a person not just against "the breaking of his doors, and the rummaging of his drawers" but against "the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense". 116 U.S. at 630, 6 S.Ct. at 532.

The Supreme Court thereafter appeared to retreat from that principle, holding in a series of cases that a search required a physical penetration. *See, e. g., United States v. Lee*, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Goldman v. United States*, 316 U.S. 129 (1942). However, in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the court broadened the amendment's protection and found invalid a "search" without a warrant by Federal Bureau of Investigation agents who had overheard a defendant's telephone conversations after attaching an electronic listening and recording device to the outside of a public telephone booth. The court said that the Fourth Amendment "protects people, not places," and that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection," but "what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. at 351, 88 S.Ct. at 511. The court held that "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." 389 U.S. at 353, 88 S.Ct. at 512.

If government agents are required to obtain a warrant before listening with a sophisticated monitoring device, one would suppose that the same requirement should apply to watching with a sophisticated telescope. Indeed, this is what *United States v. Kim*, 415 F.Supp. 1252 (D.Haw.1976), decided in circumstances indistinguishable in principle from the present case. Although there are opinions which look the other way and sustain government use without a warrant of binoculars to detect activities in private premises, *Fullbright v. United States*, 392 F.2d 432 (10th Cir.), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968), and *Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970), *cert. denied*, 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971), to "the people", including the innocent and law abiding, *United States v. Garcia*, 450 F.Supp. 1020, 1024 (E.D.N.Y.1978), a "high-powered" telescope is hardly less intrusive and offensive than a hidden microphone. Both devices could force us to close our lives in order to escape the government's watchful eyes and attentive ears. This court therefore holds that this case is governed by the *Katz* decision and that the government must obtain judicial sanction before using a telescope.

The government urges that, by conducting his activities beside an unshuttered window, defendant had no "reasonable expecta-

tion of privacy" and therefore was unprotected by the Fourth Amendment. The phrase "reasonable expectation of privacy" is not found in the majority opinion in the *Katz* case. It was enunciated by Justice Harlan in his concurring opinion, expressing his understanding of the rule emerging from prior decisions to establish "a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'." 389 U.S. at 361, 88 S.Ct. at 516. Although he later made clear that Fourth Amendment analysis must "transcend the search for subjective expectations," *United States v. White*, 401 U.S. 745, 746, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (dissenting opinion), his earlier words have been embraced in subsequent opinions and purportedly made the formula on which Fourth Amendment rights depend. *See, e. g., Rakas v. Illinois*, 439 U.S. 128, 143–144, 99 S.Ct. 421, 430–431, 58 L.Ed.2d 387 (1978); *Bell v. Wolfish*, 441 U.S. 520, 556, 99 S.Ct. 1861, 1883, 60 L.Ed.2d 447 (1979); *Arkansas v. Sanders*, 442 U.S. 753, 761, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979).

Reflection suggests, however, that the test cannot be a subjective one if the Fourth Amendment is to protect the people against a government with power to mould expectations. An announcement from the highest seat of government that the police have been directed to insert electronic monitoring devices into our homes might disabuse anyone of an expectation of privacy. But this court does not interpret the *Katz* opinion to condone such a subversion of the Fourth Amendment.

To be meaningful the rights to which a person is entitled under the amendment must be determined by objective standards. This court reads the *Katz* case to mean, as a minimum, that the people may demand privacy unless a policeman can see or hear them from a place accessible to those members of the public not preternaturally inquisitive. That this is the purport of the opinion seems clear from the fact that it excludes from the protection of the Fourth Amendment only what "a person knowingly exposes to the public." 389 U.S. at 351, 88 S.Ct. at 511. Since the telephone booth was "accessible" to a listening Tom equipped with electronic apparatus, the court must have meant by the "public" the ordinary run of people, not those who happen to possess powerful and sophisticated devices and the curiosity to use them to spy on their fellows.

As Professor Amsterdam has suggested in his thoughtful and perceptive article, *Perspectives on the Fourth Amendment*, 58 Minn.L.Rev. 349, 404–405 (1974), to those who live in urban slums and enjoy little privacy at any time even this reading of the *Katz* opinion may have only limited meaning. But at least in this case we need go no farther. Even if defendant could have been seen by those in the apartment across the street, we must assume that without the telescope they could not have determined what he was doing.

The motion to suppress is granted.