UNITED STATES of America,

v.

Matthew REGA and Allyson Boyle, Defendants.

No. 80 Cr. 311.

United States District Court, S. D. New York.

July 28, 1980.

John S. Martin, Jr., U. S. Atty. for the Southern District of New York, New York City, for United States of America; Bruce L. Owens, Asst. U. S. Atty., New York City, of counsel.

Robert S. Eisenberg, Jersey City, N. J., for defendant Allyson Boyle.

## OPINION

EDWARD WEINFELD, District Judge.

The defendant Allyson Boyle moves to suppress certain items seized from her apartment at the time of her arrest there on March 28, 1980 and additional items found in her purse during post-arrest processing later that same day while she was in custody at the headquarters of the Drug Enforcement Administration ("DEA").

After a hearing at which the defendant and four of the law enforcement agents involved in the relevant events testified, the Court finds that the circumstances surrounding Boyle's arrest and the seizures were as follows. In the mid-afternoon of March 28th, DEA agent Al Cavuto and Inspector John Comparetto, both acting in an undercover capacity, met with Joseph Corallo and Roger Bibeau in a room in the Holiday Inn on West 57th Street in Manhattan. The agents had, prior to this meeting, negotiated with Corallo and Bibeau for the purchase from the latter of one kilogram of cocaine. In the hotel room, however, Corallo produced only a quarter of a kilogram and told the agents that if they gave him $10,000 he would return to his source and pick up the remaining three-quarters.

At this point Comparetto and Bibeau went down to the hotel lobby and reported this development to a third undercover agent waiting there. In the lobby, Bibeau was arrested.

Agent Cavuto remained in the hotel room with Corallo who then told him that he had obtained the cocaine from his cousin and that he had been delayed in arriving at the rendezvous with the agents because there had been other persons at his cousin's apartment seeking to purchase narcotics and Corallo had had to wait his turn.

After Bibeau's arrest and Cavuto's conversation in the hotel room with Corallo, other agents entered the hotel room and arrested Corallo. A note was found on Corallo's person which indicated that he was to return to his cousin's apartment to obtain the additional cocaine. Both Bibeau and Corallo were armed with pistols when they were arrested.

Corallo, after his arrest and after being advised of his constitutional rights, agreed to cooperate with the agents. He agreed to take them to the apartment where he had met with his cousin and the latter's girlfriend and had obtained the one-quarter kilogram of cocaine and where he expected to receive the remaining three-quarters. He indicated to the agents that they could expect to find two persons in the apartment, a man and a woman (presumably his cousin and the cousin's girlfriend).

Corallo accompanied Comparetto, Cavuto and a third agent, Shockley, to 322 West 57th Street in Manhattan. He obtained admission to the lobby and elevator by giving his name to a security guard in the building, and went with the agents upstairs to the door of Apartment 43–T. Corallo knocked on the door of the apartment which was opened by the defendant Boyle, who admitted the four men into the living room area of the apartment.

Agent Shockley, posing as the purchaser, complained of the quality of the cocaine delivered by Corallo. Boyle told the agents that she had only picked up the package, that "they" could do better but that the agents would have to talk to "him" about it. The male referred to was not identified. Shortly after this conversation, a knock was heard at the door of the apartment and Boyle responded, admitting four additional agents of the DEA: Toal, Rooney, Hondoga and Gray.

Agent Toal, the supervising agent, immediately placed Boyle under arrest and directed his men to check the rooms of the apartment for any other persons who might be hiding there with guns and to assure the safety of his men. In response, Comparetto and Hondoga proceeded to the bedrooms and bathrooms of the apartment. Comparetto first checked the bathroom and the bathtub in it, and then entered the master bedroom where he met Agent Hondoga.

Comparetto checked under the bed and looked in the closets of this room. At this time he also observed a brown mirror with white powder on it and a green plastic grinder which he recognized as a type used to crush cocaine..

After less than a minute in the master bedroom, Comparetto returned to the living room and reported that he had seen drug paraphernalia on the dresser there. Hondoga, who left the master bedroom with Comparetto, did not return immediately to the living room but went on to check the smaller, second bedroom in the apartment. One agent reported seeing a scale in the apartment during the security check.

In the living room, while the security check was carried out, agents Toal and Cavuto placed Boyle on the couch. After being advised of her rights, Boyle indicated she would not answer any questions. Toal left the living room and went with Agent Cavuto to view the two bedrooms which had by now been checked and in which the agents had reported there was evidence in plain view.

In the master and the smaller bedroom, Toal and Cavuto observed various objects, exposed and in plain view on the surface of dressers and other furniture in the rooms. Toal directed his agents to seize whatever items were in plain view, which they did.

Before leaving the apartment with Boyle, Toal told the defendant that she would need identification and to bring a pocketbook with her. Boyle left the apartment with a brown leather purse. At DEA headquarters, during the processing of Boyle, Agent Cavuto inventoried the contents of the purse and discovered the additional items that the defendant also seeks to suppress. In total, the agents were in Boyle's apartment for approximately thirty minutes.

As to the seizure of the items from the apartment's bedrooms, the defendant claims that the search leading to these seizures was unlawful as beyond the scope of a

reasonable search incident to arrest under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The government, however, does not seek to justify the seizures on this ground. Rather its position is that the objects were properly seized because they were observed in "plain view" during the course of a lawful security check of the premises on which the defendant was arrested.

■ Under the "plain view" doctrine, three elements must be established to authorize a warrantless seizure: (1) the seizing agents must be lawfully on the premises; (2) the discovery must be inadvertent; and (3) the evidentiary nature of the objects observed must be immediately apparent.[1]

■ As to the first element there can be no doubt that the agents were lawfully on the premises of Boyle's apartment. Once Corallo agreed to cooperate, the agents were fully justified in immediately proceeding with him to the apartment where he was to have obtained the balance of the cocaine, with the prospect of apprehending others engaged in the conspiracy red-handed and of locating the source of the narcotics. The agents—both those who arrived with Corallo and those who knocked some minutes later—were readily admitted to the apartment by Boyle. Moreover, in the light of what had transpired at the hotel, Corallo's statements about the activities in the apartment, and Boyle's own discussion with the undercover agents about the quality of the cocaine already delivered and that "we have better," the agents had probable cause to believe she was a member of the conspiracy to distribute illicit drugs and was then engaged in acts in furtherance of the conspiracy and thus she was subject to arrest without a warrant.

The only issue presented here is whether in leaving the immediate living room area in which Boyle was arrested, the agents exceeded the bounds of their lawful entry. It is clear that they did not. The agents

**1.** *See United States v. Berenguer*, 562 F.2d 206, 210 (2d Cir. 1977); *United States v. Ochs*, 595 F.2d 1247, 1257–59 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

were entirely justified in conducting a limited security check of the entire apartment to ascertain that no other persons were in the apartment who might pose a threat to the officers or destroy evidence.[2] This precautionary measure was especially necessary in this case given the agents' knowledge that there was at least one other person involved in the unlawful activity described by Corallo and Boyle, that other purchasers of drugs had been on the premises earlier, and that both Bibeau and Corallo had worn guns when they were arrested. Moreover, in view of Corallo's statement when he agreed to cooperate that the person from whom he obtained the one-quarter kilogram was in the apartment, the agents' concern both for their safety as well as the prospect of destruction of the balance of the sale once Boyle was arrested, was real and not fanciful.

■ Undoubtedly, the agents were entitled to seize items observed in plain view during the security check.[3] The defendant contends that nonetheless the seizures here were improper because they were not made during the security check itself but immediately afterwards. It borders on the absurd, however, to suggest that agents must stop in the middle of a security check to immediately seize evidence in plain view in order for its seizure to be lawful. Where, as here, the agents conducting the check observed evidence in plain view as they passed through the rooms and reported their observations to the agent in charge who, after entering the rooms to corroborate the discovery, directed its seizure—all within moments—there is no greater intrusion than if the agents upon first entering the rooms had immediately taken a few additional moments (at the risk of their lives perhaps) to observe and seize all evidence in plain view; a step they were certainly entitled to take.[4]

A remaining issue is whether the items seized were in fact in plain view. Each agent who testified stated that the items were exposed to view on top of furniture in the bedrooms; that no drawers were opened; and that nothing was disturbed in order to find evidence. Boyle testified that from the living room she heard drawers, closets, the medicine chest and the shower doors opened and closed. She did not testify, however, that any of the seized matter had been hidden from view nor was she in the bedrooms during the security check.[5] The Court perceives no reason not to credit the uncontradicted testimony of the agents and finds that the items seized were in plain view.

■ Briefly turning to the two remaining elements of the "plain view" doctrine, there is no question that the agent's discovery of the evidence was inadvertent. There is no indication that the agents had advance knowledge of the location of the evidence or intended to seize it and mere expectation or suspicion that discovery would occur does not preclude application of the doctrine.[6] Similarly there is no contention that the items seized failed to reveal their evidentiary value immediately upon observation.[7]

2. *See United States v. Gomez*, No. 79 1441 (2d Cir. July 11, 1980), slip opinion at 4372; *United States v. Agapito*, 620 F.2d 324 (2d Cir. 1980), *United States v. Christophe*, 470 F.2d 865, 869 (2d Cir. 1972), *cert. denied,* 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973); *United States v. Baker*, 577 F.2d 1147, 1152 (4th Cir.), *cert. denied,* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978) (citing cases); *United States v. Cravero*, 545 F.2d 406, 417–18 (5th Cir. 1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977).

3. *See United States v. Gomez*, No. 79-1441 (2d Cir. July 11, 1980), slip opinion at 4372.

4. *See United States v. Moore*, 463 F.Supp. 1266, 1271 (S.D.N.Y.1979).

5. Boyle's testimony as to the sounds she heard may be explained by the fact that the agents did indeed open both closet and shower doors during the security check for persons on the premises.

6. *See United States v. Liberti*, 616 F.2d 34, 37 (2d Cir. 1980).

7. The defendant has questioned whether the agents were justified in seizing a note written on the top sheet of a pad in plain view on a dresser since the agents would have had to have read the note to ascertain its evidentiary

In sum, the Court finds that the entry of the agents into the Boyle apartment bedrooms and the seizure of evidence in plain view therefrom was proper and did not violate the defendant's constitutional rights.

Boyle has also challenged the seizure of items from her handbag during her post-arrest processing at the DEA's headquarters. There is some dispute in the record as to how this particular purse came to be transported with Boyle to the DEA building after her arrest. Boyle contends the purse was one she had not been using and was brought to her from the bedrooms by one of the agents. Some of the agents testified that the purse was on the living room couch before the agents left with Boyle. Boyle acknowledges that she was told to bring identification and since this was so, the Court rejects her version that after being so advised, the agents went into a bedroom or elsewhere and seized her purse. To say the least, her version is not plausible. The Court finds she took the purse with her when she left the apartment.

At DEA headquarters, Agent Cavuto and another agent made a routine inventory of the purse's contents. It was during this inventory and not through any investigatory search that the items in question were discovered and seized. Once the defendant was lawfully in custody, the officers had full authority to catalogue her clothing and personal effects and to seize items of evidence revealed in the process.[8] Accordingly, there was no impropriety in the seizure of objects from Boyle's purse.

In accordance with the foregoing, the defendant Boyle's motion is denied in its entirety.

---

character. The seizure of documents as in "plain view" is not improper however, notwithstanding the fact that some perusal is needed for the seizing agents to perceive the relevance of the documents to crime. *See United States v. Ochs*, 595 F.2d 1247, 1257 n. 8 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979) (citing cases).

8. *See United States v. Edwards*, 415 U.S. 800, 806–08, 94 S.Ct. 1234, 1238–39, 39 L.Ed.2d 771 (1974); *United States v. Ziller*, 623 F.2d 562 (9th Cir. 1980) (seizure of note in wallet); *United States v. Jeffers*, 524 F.2d 253, 255 (7th Cir. 1975) (seizure of objects in purse). *Cf. United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (warrantless search of foot locker after it was secured in police custody was not lawful); *United States v. Smith*, 621 F.2d 483 (2d Cir. 1980) (suggesting *Chadwick* not applicable to non-investigative inventory).