**UNITED STATES of America**

v.

**Daniel BIFIELD and Susan Corin Bouton.**

**Crim. No. B 80–11.**

United States District Court, D. Connecticut.

Sept. 9, 1980.

H. James Pickerstein, Jeremiah Donovan, Asst. U. S. Attys., Bridgeport, Conn. (Richard Blumenthal, U. S. Atty.) for the United States of America.

James J. Diorio, Bridgeport, Conn., for defendant Bifield.

Salvatore De Piano, De Piano, Petrucelli & Palmesi, Bridgeport, Conn., for defendant Bouton.

## MEMORANDUM AND ORDER ON MOTIONS TO SUPPRESS EVIDENCE

JOSÉ A. CABRANES, District Judge:

A federal grand jury sitting in Bridgeport has returned a two–count indictment,

charging each of the defendants with a single violation of 18 U.S.C. App. § 1202(a)(1). Under that statute, the receipt, possession or transportation "in commerce or affecting commerce" of "any firearm" by a "person who has been convicted by a court of the United States or of a State or any subdivision thereof of a felony" is a federal crime.[1]

The defendants, Daniel Bifield and Susan Corin Bouton, were arrested by local police officers in Milford, Connecticut, for violating various state laws, including a Connecticut statute which prohibits the carrying or possession of a loaded shotgun in a vehicle. The arresting officers, who apprehended the defendants without a warrant after seeing what appeared to be a shotgun in their automobile (and after observing Bifield apparently removing shells from that shotgun), proceeded to conduct a "pat-down" search of Bouton. This search, which was conducted without a search warrant, yielded a loaded handgun. In addition, the police seized a shotgun and shotgun shells from the floorboard of the automobile in which the defendants had been riding when apprehended.

The defendants have moved to suppress the guns and ammunition seized by the Milford police officers, so that they could not be used against the defendants at the trial of this case. Upon consideration of the evidence presented at a hearing on the motions to suppress, which was held in Hartford on August 21 and 22, 1980, and the parties' briefs, the court renders the findings of fact and conclusions of law which appear below. As stated in greater detail below, the court holds that: (1) the police had probable cause to arrest the defendants for violating state law, so that the arrests were permissible under the Fourth Amendment to the United States Constitution; (2) the warrantless post-arrest searches and seizures did not violate the Fourth Amendment; and (3) the use of a telescope and a telephoto lens by Milford police officers observing and photographing the defendants hours before their arrests was not improper under the Fourth Amendment, and even if this activity was impermissible, it did not taint the subsequent arrests, searches or seizures. Accordingly, the motions to suppress are denied in all respects.

## I. Findings of Fact

At approximately 8:00 p. m. on October 3, 1979, Detective John Torento and Officer Paul Duff of the Milford Police Department commenced a surveillance mission in the vicinity of the Robert Treat Exxon station ("the Exxon station"), which is located on Bridgeport Avenue, near the corner of Robert Treat Parkway, in Milford.[2] The surveillance had been ordered by the Milford police as a result of reports indicating that weapons had been displayed and fired at the Exxon station.[3]

Torento and Duff conducted their surveillance from a camper van attached to the rear of a pickup truck parked at Dirienzo's Arco service station, located across Bridgeport Avenue from the Exxon station.[4] They were approximately 150 or 160 feet away from the office of the Exxon station.[5] Torento and Duff brought with them a camera, equipped with a telephoto lens, and

---

**1.** In the case of Bifield, the predicate felony cited in the indictment is assault upon a peace officer, in violation of Conn.Gen.Stat. § 53a-167c(a)(1); he was allegedly convicted of this crime in the Superior Court for Fairfield County on March 7, 1975. Bouton was allegedly convicted of carrying a pistol without a permit, in violation of Conn.Gen.Stat. § 29–35, in the Court of Common Pleas, Geographical Area 4, on March 20, 1979.

**2.** Transcript of Hearing on Motions to Suppress ("Tr.") 15–17, 274. In the area of the Exxon Station, Bridgeport Avenue has two lanes for through traffic (one for eastbound vehicles, one for westbound traffic) and a "turning lane" for vehicles turning onto Robert Treat Parkway. Tr. 190–91. The area was described by Detective Torento as a "light commercial" zone, and Bridgeport Avenue in that vicinity is evidently lined with small businesses, including gasoline stations, fast-food restaurants and small factories. See Tr. 282.

**3.** Tr. 15–16, 257–58, 274, 316.

**4.** Tr. 17–18, 274–75.

**5.** Tr. 19, 276.

a telescope with a "13–40 power" zoom lens.[6] Duff took pictures with the camera, but spent much of his time observing events at the Exxon station with his naked eyes, unaided by the camera lens; Torento used the telescope to observe the "goings on" across the street in greater detail than would otherwise have been possible.[7] Torento and Duff made their observations and took their photographs through a recently cleaned window in the rear of the van, facing the Exxon station.[8]

Between 8:15 and 8:20 p. m., defendants Bifield and Bouton, along with one William Blake, arrived at the Exxon station in a 1973 Cadillac driven by Bifield.[9] The vehicle was first parked in a garage bay, adjacent to the office of the Exxon station.[10] Bifield, Bouton and Blake left the car, with Bifield holding in his right hand an object which Officer Duff described as "a black colored semi–automatic handgun"; Duff, who viewed the scene without the assistance of the telephoto lens, observed Bifield placing the gun in his waistband.[11] Torento, looking through the telescope, saw the same thing.[12]

Bifield walked into the office of the Exxon station, where Scott McCoy, an employee of the station, was standing.[13] Meanwhile, the Cadillac in which Bifield, Bouton and Blake had arrived was moved into the garage bay, giving Duff and Torento, who were in the van across the street, a clear view of the entire office area.[14] The office

was illuminated and street lights on Bridgeport Avenue were lit.[15] Otherwise, the Exxon station (which was not open for regular business) and the vicinity were dark.[16]

Two men whom Duff and Torento did not recognize arrived at the Exxon station, joining Bifield, Bouton, Blake and McCoy.[17] The police observed the activity of the people in the office of the Exxon station; Duff saw, with his naked eyes, Bifield withdraw a handgun from his waistband and pass it around to the others.[18] Duff then saw Bifield grab Bouton and put the handgun beneath her chin, apparently in jest; the others in the Exxon station acted as if they were amused by this horseplay.[19] Torento, who used the telescope, saw essentially the same thing, although it appeared to him that Bifield placed the gun under Bouton's chin twice in a period of 20 to 25 seconds.[20] After this incident, Bifield placed the gun back into his waistband.[21]

A short time later, Bifield left the office, walked to the rear of the garage bay and disappeared from the sight of the surveillance agents who were across the street; he returned to their view carrying what appeared to be, in Duff's words, a "shoulder weapon."[22] Bifield apparently left this weapon in the bay area, behind a brick pillar, and then returned to the office without it.[23]

Approximately 5 to 10 minutes after Bifield returned to the office, Bouton carried

6. Tr. 20–25, 159–60, 277–78.

7. Tr. 25–27, 159, 182–83, 316–17.

8. Tr. 157–58, 182–84.

9. Tr. 28–29, 34, 282–83. Officer Duff knew Bifield prior to October 3, 1979, and was aware that Bifield had been convicted of assaulting a police officer. Tr. 263, 265. Detective Torento recognized Bifield and Blake from previous contact with them. Tr. 283.

10. Tr. 29, 34.

11. Tr. 34–35, 193–96.

12. Tr. 285–88.

13. Tr. 43, 54.

14. Tr. 56.

15. Tr. 19–20, 276.

16. Tr. 18–19, 276–77.

17. Tr. 57–58.

18. Tr. 58, 61–62, 197.

19. Tr. 62–63.

20. Tr. 291–92, 335–36.

21. Tr. 65, 200.

22. Tr. 65–66. At the time Duff could not determine what type of a "shoulder weapon" Bifield was carrying. Tr. 73.

23. Tr. 66–67, 69–70.

a "shoulder weapon"–specifically, a pump–action shotgun–to the Cadillac, and placed in in the car.[24] Shortly thereafter, Bouton, Bifield and Blake got back in the Cadillac and drove away from the Exxon station, heading west on Bridgeport Avenue.[25]

By radio transmission from the van, Torento called for the unit backing up the surveillance team.[26] When the back–up officers proved to be unavailable, Toronto called Milford police headquarters on the radio, describing what he and Duff had observed and requesting that other police cars look out for the Cadillac.[27] Although Duff and Torento intended that other police officers locate the Cadillac and arrest its occupants, the car was not stopped at this time; Duff and Torento ended their surveillance mission.[28]

Later that evening, the Milford Police Department received a call from William Blake, who, as one of the occupants of the 1973 Cadillac, had been observed at the Exxon station by Duff and Torento; Blake, who called from the same Exxon station, asked to see a police officer in order to make a report about a stolen vehicle.[29] While another officer was dispatched to the Exxon station to take the complaint, Duff and Torento, accompanied by Sergeant Jerry Hanahan, returned to the vicinity of the Exxon station in an unmarked police car.[30] In the belief that the weapons which Duff and Torento had seen earlier in the evening would still be in the Cadillac, Duff, Torento and Hanahan parked their car across the street from the Exxon station, in the park-ing lot of a Kentucky Fried Chicken restaurant, and waited to make an arrest.[31]

Officer Duff left the car to get coffee from a coffee shop located on Bridgeport Avenue, beyond the Exxon station, and to observe what was happening at the station.[32] Passing the Exxon station, he saw Bifield, Bouton and Blake conversing with a police officer, who had evidently responded to Blake's request, in the lighted office.[33] After Duff brought coffee back to the police car, the surveillance team saw their fellow police officer leave the Exxon station and observed Bifield drive the Cadillac, in which Bouton and Blake were passengers, out of the station and onto Bridgeport Avenue.[34]

As the Cadillac drove past the unmarked police car in which Duff, Torento and Hanahan were sitting, Torento started the police car and began to pursue the Cadillac in an effort to stop it.[35] The police flashed a red light located in the grill of their car, sounded a siren and directed a spotlight at the Cadillac.[36] Nonetheless, the Cadillac did not immediately stop; rather, it slowed down, pulled over to the right side of the road and continued to drive down Bridgeport Avenue for ³/₁₀ of a mile, while the police continued to flash their lights and sound their siren.[37] As the Cadillac continued down the street, with the spotlight shining on the interior of that car, Duff and Torento saw Bifield lean over and make a jerking motion with his right arm and shoulder; on the basis of their experience

**24.** Tr. 71–72, 74, 204, 295.

**25.** Tr. 75–76.

**26.** Tr. 77, 231–32.

**27.** Tr. 77–78, 232.

**28.** Tr. 77–79, 92, 206–08.

**29.** Tr. 93, 214, 216, 306.

**30.** Tr. 92–94, 306–07. The police intentionally delayed the arrival of an officer in response to Blake's complaint, apparently in order to give Duff, Torento and Hanahan time to get to the vicinity of the Exxon station. *See* Tr. 215–16.

**31.** Tr. 94, 216, 307.

**32.** Tr. 95, 218, 266.

**33.** Tr. 95, 266.

**34.** Tr. 96–97.

**35.** Tr. 97, 307. These events transpired at approximately 10:40 p. m. Tr. 307.

**36.** Tr. 97–98, 307–08.

**37.** Tr. 98–99, 124–25, 309.

both believed that Bifield was removing shells from a loaded pump action shotgun.[38]

When the Cadillac finally came to a stop, Duff, Torento (whose gun was drawn) and Hanahan approached the car and ordered the occupants to get out of the vehicle.[39] Duff looked into the Cadillac and saw a 12-gauge pump action shotgun lying on the front floorboard.[40] Duff told Hanahan about the shotgun and Hanahan said, "Place them under arrest."[41] Duff then "patted down" Bouton for weapons and found a black .45 caliber semi–automatic handgun in the waistband of her trousers.[42] This gun was loaded with six live .45 caliber rounds.[43] Duff seized the shotgun on the floorboard in the front of the car, and Torento found (and apparently seized) the shotgun shells which were also on the front floorboard.[44]

Among the offenses for which the defendants and Blake were arrested was a violation of Conn.Gen.Stat. § 53–205,[45] which provides in pertinent part that

> [n]o person shall carry or possess in any vehicle or snowmobile any shotgun or rifle or muzzleloader of any gauge or caliber while such shotgun or rifle or muzzleloader contains in the barrel, chamber or magazine any loaded shell or cartridge capable of being discharged. . . .

It is undisputed that the police obtained no warrants either for the arrest of the defendants or for searching Bouton or the Cadillac.

### II. Conclusions of Law

On the basis of the facts adduced at the hearing on the motions to suppress, the court concludes—contrary to the defendants' arguments—that: (a) the arresting officers had probable cause to effect the arrests of Bifield and Bouton for violating Conn.Gen.Stat. § 53–205; (b) the warrantless searches and seizures at issue here were proper, because (1) the seizure of the handgun from the person of Bouton was the result of a valid "search incident to arrest" and (2) the police had probable cause to search the automobile in circumstances under which it would not have been practicable to have obtained a warrant; and (c) the use by the police, without prior judicial approval, of a telescope and telephoto lens to observe and photograph the defendants was not unconstitutional and does not render invalid the subsequent arrests, searches and seizures. Accordingly, the court concludes that the defendants' Fourth Amendment rights were not violated by the police conduct challenged here. The court's conclusions are discussed at some length, *seriatim*, below.

### A. Probable Cause to Arrest Bifield and Bouton

"Probable cause to arrest exists when an officer has knowledge of facts and circumstances 'sufficient to warrant a prudent man in believing' that an offense is being or has been committed." *United States v. Edmonds*, 535 F.2d 714, 719 (2d Cir. 1976), *quoting Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). *See also Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979); *United States v. Agapito*, 620 F.2d 324, 333 (2d Cir. 1980); *United States v. Rueda*, 549 F.2d 865, 870 (2d Cir. 1977).

In this case, the arresting officers observed, at relatively close range and in favorable lighting conditions: (a) Bifield and Bouton in a motor vehicle; and (b) Bifield making motions with his right arm and shoulder which clearly appeared to constitute the removal of shells from a loaded

---

**38.** Tr. 99–101, 124, 308–09.

**39.** Tr. 125, 309.

**40.** Tr. 126; *see* Exhibit 20.

**41.** Tr. 126.

**42.** Tr. 126–27; *see* Exhibit 21.

**43.** Tr. 128.

**44.** Tr. 310, 313.

**45.** Tr. 225, 233, 311–12. The other offenses with which the defendants were initially charged are not relevant to the pending motions in this case.

shotgun. From these facts, the officers were justified in the belief that the defendants had violated Conn.Gen.Stat. § 53–205, which, *inter alia*, prohibits carrying or possessing a loaded shotgun in a motor vehicle. Probable cause for the arrest therefore existed.

The defendants have argued that their arrests were somehow invalid because the police lacked probable cause to arrest them at the time they first attempted to stop the Cadillac in which Bifield, Bouton and Blake were riding.[46] This argument misses the point; the relevant question is whether probable cause to arrest existed *at the time of the arrest, see Draper v. United States,* 358 U.S. 307, 314, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959), not some earlier time. Thus, it is immaterial that the police might not have had probable cause to effect an arrest before they saw Bifield remove shells from a shotgun in the Cadillac; because probable cause existed at the time of the arrests, the arrests are valid.

However, the argument that the arrests—even if otherwise valid—were somehow tainted by the lack of a sufficient basis for the police to stop the defendants' Cadillac raises a related question: whether the officers had enough information to approach the defendants' car in order to make an investigative stop of it when they saw it pull out of the Exxon station for the second time on the evening of October 3, 1979.

The Court of Appeals for the Second Circuit has recently summarized the standards for determining the constitutionality of such a stop:

It is well settled that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). An officer need have only a reasonable suspicion that criminal activity is afoot before subjecting a person to an investigatory stop. *United States v. Vasquez,* 612 F.2d 1338, 1342 (2d Cir. 1979). At the same time, however, the officer must be able to articulate the specific and objective facts that form the basis for that reasonable suspicion. *United States v. Ariza,* 615 F.2d 29, 33 (2d Cir. 1980).

*United States v. Gomez,* 633 F.2d 999, 1004 (2d Cir. 1980).

In this case, the police had observed gunplay involving the defendants earlier in the evening, in the very area where they were ultimately stopped. Duff and Torento had reason to believe, as a result of their earlier surveillance of the Exxon station, that guns might have been in the Cadillac, for they had seen Bifield tuck a handgun into his waistband at the Exxon station and subsequently enter the car, and had observed Bouton carry a shotgun into the Cadillac before the defendants and Blake rode away in it. These "specific and objective facts" formed the basis for a "reasonable suspicion," *United States v. Gomez, supra* at 1004, not only that criminal activity was "afoot," *id.,* but also that the safety of police officers or others might be in danger. *See Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972); *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883 (police may make a stop where they have "reason to

---

**46.** The defendants contend that they were under arrest as soon as the police sounded the siren and began flashing the lights of their unmarked car, in an effort to stop the defendants' Cadillac. This claim is untenable, for the police had effected neither "actual or constructive seizure or detention of the person[s]" of the defendants, *Hicks v. United States,* 382 F.2d 158, 161 (D.C.Cir. 1967) (Burger, J.), *quoting Jenkins v. United States,* 161 F.2d 99, 101 (10th Cir. 1947), at least until the defendants had actually been stopped some ³/₁₀ of a mile

down Bridgeport Avenue from the point at which the siren was first sounded and the lights were first flashed. *See United States ex rel. Griffin v. Vincent,* 359 F.Supp. 1072, 1075–76 (S.D.N.Y.1973); *cf. Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959) (arrest took place when car had been stopped by federal agents). On this question, the fact that the police may have intended to arrest the defendants at some earlier point is not controlling. *Cf. United States v. Pellegrini,* 309 F.Supp. 250, 255 (S.D.N.Y.1970).

believe that [they are] dealing with an armed and dangerous individual, regardless of whether [they have] probable cause to arrest the individual for a crime"). In this connection, the officers could take into account their knowledge of Bifield's recent conviction for assaulting a police officer, Tr. 263, 265; *cf. United States v. Gomez, supra,* at 1004; *United States v. Oates,* 560 F.2d 45, 59–60 (2d Cir. 1977), and the reports of the exhibition and firing of weapons in the vicinity of the Exxon station which had drawn them to the area in the first place. Tr. 16, 257–58, 274; *cf. United States v. Brignoni–Ponce,* 422 U.S. 873, 884–85, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) (characteristics of area, including recent criminal activity of similar type, may be considered in determining reasonableness of investigative stops); *United States v. Gomez, supra* at 1004 (same).

█ In sum, it would have been proper for the police officers to have stopped the Cadillac, as they sought to do, for investigative purposes. It is unnecessary for the court to consider how intrusive a stop would have been permissible,[47] for by the time the police succeeded in apprehending the defendants—some ³⁄₁₀ of a mile after they first tried to stop the defendants' Cadillac—they had already observed, at first hand, additional facts sufficient to satisfy the more stringent "probable cause" test for an arrest.[48]

For the foregoing reasons, the court concludes that the police officers' decision to stop the defendants was not improper and that the subsequent arrests of the defendants were made in accordance with the requirements of the Fourth Amendment.

## B. The Searches and Seizures

### (1) The Search of Bouton and the Seizure of the Handgun

█ Having lawfully arrested the defendants,[49] the police were constitutionally

---

**47.** The intrusiveness of a stop is, of course, a crucial factor in determining its validity. "[T]he scope of the particular intrusion, in light of all the exigencies of the case, [is] a central element in the analysis of reasonableness." *Terry v. Ohio,* 392 U.S. 1, 17 n.15, 88 S.Ct. 1868, 1878 n.15, 20 L.Ed.2d 889 (1968), *see United States v. Magda,* 547 F.2d 756, 759 (2d Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977). Here, consideration of this factor would be futile, since no stop was ever effected until the officers had ample probable cause for a full arrest. However, it can safely be said that the police would have been justified in stopping the Cadillac and asking questions relevant to their suspicions; the court cannot, and will not, presume that the police would have made unreasonable intrusions into the defendants' privacy had the defendants promptly obeyed the request that they stop their automobile.

**48.** The court rejects any suggestion that the police acted improperly by delaying their attempted stop. *See* note 30, *supra.* As the Court of Appeals for the Second Circuit noted in *United States v. Gomez,* 633 F.2d 999 (2d Cir. 1980), courts should "hesitate to require agents to stop suspects immediately upon developing reasonable suspicion. The interests of the Fourth Amendment might well be served by deferring the stop since additional surveillance might dispel or bolster the agents' suspicions of criminal activity." *Id.* at 1005 n.9. In any

event, here, as in *Gomez,* there is no evidence of a "bad faith delay" in the police efforts to stop the defendants, see *id.* at 1005, and the fact that the police did not attempt to stop the defendants when they first suspected that criminal activity was taking place does not invalidate either the efforts to stop the defendants or their subsequent arrests.

**49.** Remarkably, the defendants challenge the authority of the police officers to arrest them, on the theory that Connecticut law does not permit a municipal police officer to make a warrantless arrest for a misdemeanor on the basis of probable cause. This position is squarely contradicted by Conn.Gen.Stat. § 54–1f (formerly Conn.Gen.Stat. § 6–49), which provides, *inter alia,* that "police officers . . . in their respective precincts shall arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when such person is taken or apprehended in the act or on the speedy information of others . . . ." By "any offense," the statute includes misdemeanors as well as felonies. *See State v. Elliott,* 153 Conn. 147, 151–52, 215 A.2d 108, 110 (1965); *State v. DelVecchio,* 149 Conn. 567, 574, 182 A.2d 402, 405 (1962). Moreover, the Supreme Court of Connecticut has held that a person "is lawfully 'taken or apprehended in the act' if the circumstances observed by the officer preceding the arrest, viewed in the light of common knowledge and experience, gave him probable cause to believe that a crime was

permitted to make a search of their persons and the area within their immediate control, *i. e.,* "the area from within which [they] might gain possession of a weapon or destructible evidence." *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). The scope of the "search incident to arrest" exception to the warrant requirement clearly includes "the area into which an arrestee might reach in order to grab a weapon." *Id.* It cannot be doubted that the search of Bouton's waistband, conducted immediately after her arrest, was permissible under the *Chimel* doctrine. Accordingly, the search of Bouton by Officer Duff constituted a "reasonable" search under the Fourth Amendment. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973). There is no basis for suppressing the fruits of that search—a .45 caliber semi-automatic handgun which Bouton was carrying in her waistband at the time of her arrest and the bullets contained in that gun.

### (2) The Seizure of the Shotgun and the Shotgun Shells

■ It is well established that if there is probable cause for a search, "automobiles and other vehicles may be searched without warrants 'where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'" *Chimel v. California, supra,* 395 U.S. at 764 n.9, 89 S.Ct. at 2040 n.9, *quoting Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925); *see also Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979) (where car was used for illegal purpose and was parked on street, with the defendant inside it at the time of arrest, the arresting officers were entitled to search for evidence, including weapons). *See generally* Note, *Warrantless Searches and Seizures of Automobiles,* 87 Harv.L.Rev. 835 (1974); Note, *Warrantless Searches and Seizures of Automobiles and the Supreme Court from Carroll to Cardwell: Inconsistently Through the Seamless Web,* 53 N.C.L.Rev. 722 (1975).

■ Here, the police had probable cause to search the automobile for weapons, including the shotgun which they had seen Bifield unload seconds before the vehicle came to a stop.[50] In order to effect such a search, they either had to make it immediately without a warrant or seize the car itself without a warrant while procuring a

being, or had just been, committed." *State v. DelVecchio, supra,* 149 Conn. at 575, 182 A.2d at 406. *See also State v. Holmes,* 160 Conn. 140, 147, 274 A.2d 153, 156 (1970); *State v. Sweeney,* 157 Conn. 485, 488, 255 A.2d 622, 624 (1969); *State v. Elliott, supra,* 153 Conn. at 152, 215 A.2d at 111–12.

The fact that the crime in question here—possessing or carrying a loaded shotgun in a vehicle—is a misdemeanor does not render Conn. Gen.Stat. § 54–1f inapplicable. It merely means that the requisite probable cause is probable cause to believe that a crime was then occurring or had just occurred; in felony cases, that statute also authorizes arrests where there is probable cause that a crime has been committed, without the requirement that the police have substantially contemporaneous information. *See generally* Conn.Gen.Stat. § 54–1f ("members of the state police department or of any local police department or county detectives shall arrest, without previous complaint and warrant, any person who such officer has reasonable grounds to believe *has committed* or is committing a felony") (emphasis added);

*State v. Hoffler,* 174 Conn. 452, 459–60, 389 A.2d 1257, 1261 (1978). The court's conclusion, *see* pp. 502–504, *supra,* that the police had probable cause to arrest the defendants for criminal conduct which was being or had *just been committed* therefore disposes of the contention that the arrest was not authorized by state law.

**50.** The government has challenged the defendant's standing to seek the suppression of the shotgun and shotgun shells. In light of *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the inquiries into standing and the merits of a claim of illegal search and seizure "merge into one: whether governmental officials violated any legitimate expectation of privacy held by [the defendants]." *Rawlings v. Kentucky,* —— U.S. ——, ——, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980). It is this question which the court addresses; whether labeled an issue of "standing" or one of the merits, the government prevails on it, for the reasons stated below.

search warrant for its contents; if neither of these courses—both involving warrantless seizures—had been pursued, the car could readily have been moved, with the weapon and ammunition inside it. *See Chambers v. Maroney, supra,* 399 U.S. at 51, 90 S.Ct. at 1981. The police therefore acted properly, and violated no Fourth Amendment rights of the defendants, when they seized the shotgun and shotgun shells from the floorboard of the Cadillac while it was parked on the side of Bridgeport Avenue, immediately after the defendants had been arrested.[51]

The case law authorizing warrantless searches of automobiles on the basis of probable cause in circumstances which do not as a practical matter permit the officers to obtain a search warrant has a special concern for situations in which the police would be justified in the belief that the automobile contained contraband subject to forfeiture. *See Chambers v. Maroney, supra,* 399 U.S. at 47–49, 90 S.Ct. at 1979; *Cooper v. California,* 386 U.S. 58, 61–62, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967); *Carroll v. United States, supra,* 267 U.S. at 153–59, 45 S.Ct. at 285; *United States v. Capra,* 501 F.2d 267, 280 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). Here, the police had probable cause to believe that the automobile which Bifield was driving contained a weapon subject to forfeiture under Connecticut law. As noted previously, at the time they arrested the defendants, the police knew that Bifield had been convicted of the felony of assaulting a police officer and had just observed Bifield unloading a shotgun in the Cadillac. Under Conn.Gen.Stat. § 53–206(a), any "dangerous or deadly weapon or instrument" which is in the possession of a person unlawfully carrying it without a permit is subject to forfeiture; the statute provides that no permit may be issued "to any applicant who has ever been convicted of a felony." Because the police not only had probable cause to search the vehicle for evidence of a crime, but specifically had probable cause to believe that the Cadillac contained a weapon subject to forfeiture, the warrantless seizure of the shotgun and shotgun shells was particularly appropriate under *Chambers, Carroll* and similar cases.

## C. The Use of the Telescope and Telephoto Lens During Police Surveillance

Relying heavily on the recent opinion of Judge Nickerson in *United States v. Taborda,* 491 F.Supp. 50 (E.D.N.Y.1980), the defendants argue that the use by Officer Duff and Detective Torento of powerful artificial lenses in the course of their surveillance of the defendants, hours before they were arrested, violated the defendants' Fourth Amendment rights and tainted the subsequent arrests, searches and seizures.[52] In *Taborda,* the court held that agents of

---

**51.** The court's conclusion that the seizure of the shotgun and shotgun shells was permissible on the basis of the existence of probable cause obviates the need to address the question whether the "plain view" doctrine, *see Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968) (per curiam); *United States v. Rollins,* 522 F.2d 160, 166 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976), justified that seizure. In passing, the court notes that there is little difficulty with the government's contentions that the police were in the area lawfully and that the shotgun and shells came into their "plain view," as required under this doctrine. However, it might be argued that the police, having seen the shotgun in the Cadillac before it stopped and before its occupants were arrested, had "advance knowledge," *United States v. Liberti,* 616 F.2d 34, 37 (2d Cir. 1980); *United States v. Rega,* 496 F.Supp. 101, 104 (S.D.N.Y. 1980) (Weinfeld, J.), that this weapon would be found in the car. Under *Liberti,* this would remove the seizure from the "plain view" doctrine, since that justification for warrantless seizures of evidence does not apply unless discovery of the evidence is "inadvertent." *See United States v. Liberti, supra,* 616 F.2d at 37.

**52.** The government has challenged the standing of the defendants to challenge this "search and seizure." The court does not treat separately the question of standing in view of its holding that no illegal "search" or "seizure" took place. *See* note 50, *supra.*

the Drug Enforcement Administration could not, in the absence of prior judicial authorization, constitutionally use a high-powered telescope to observe allegedly criminal activity occurring in the kitchen of an apartment apparently occupied by the defendant. The *Taborda* decision was premised on Judge Nickerson's finding that the use of the telescope to observe events in the apartment intruded on that which the defendant sought "to preserve as private," *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). *United States v. Taborda, supra*, 491 F.Supp. at 52.

The *Taborda* holding finds support in *United States v. Kim*, 415 F.Supp. 1252 (D. Hawaii 1976), in which the court similarly held that the use by federal agents of a telescope to observe activities in the defendant's apartment was unconstitutional unless a search warrant authorizing such conduct had previously been obtained. However, in other cases, resort to artificial devices aiding the vision of law enforcement officers has been held permissible, notwithstanding the officers' failure to obtain a search warrant. *See Fullbright v. United States*, 392 F.2d 432 (10th Cir.), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968) (federal agents did not violate Fourth Amendment rights of defendants when they observed defendants' activities in a shed on a farm with the aid of binoculars); *Commonwealth v. Hernley*, 216 Pa.Super. 177, 263 A.2d 904 (1970), *cert. denied*, 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971) (FBI did not violate Fourth Amendment rights of defendants by observing events in their shop with the assistance of binoculars); *see also Commonwealth v. Williams*, 262 Pa.Super. 508, 516–518, 396 A.2d 1286, 1290–91 (1978); *Johnson v. State*, 2 Md.App. 300, 234 A.2d 464 (Ct.Sp.App.1967); *cf. On Lee v. United States*, 343 U.S. 747, 754, 72 S.Ct. 967, 972, 96 L.Ed. 1270 (1952) ("The use of bifocals, field glasses or the telescope to magnify the object of a witness' vision is not a forbidden search or seizure . . . .") (dicta); *United States v. Lee*, 274 U.S. 559,

563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927) (Brandeis, J.) (holding that use of searchlight to illuminate motor boat on high seas did not constitute a "search"; "[s]uch use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution.").

The court need not address the question whether *Taborda* was rightly decided, for this case differs from *Taborda* in significant respects. This case, like *Taborda*, is governed by the principles announced in *Katz v. United States*, 389 U.S. 348, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967):

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See *Lewis v. United States*, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312; *United States v. Lee*, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. See *Rios v. United States*, 364 U.S. 2; [80 S.Ct. 1431, 4 L.Ed.2d 1688;] *Ex parte Jackson*, 96 U.S. 727, [24 L.Ed. 877].

*See also Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) ("The Fourth and Fourteenth Amendments protect the legitimate expectation of privacy of persons, not places"); *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (application of the Fourth Amendment depends upon "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"); *United States v. Dionisio*, 410 U.S. 1, 8, 93 S.Ct. 764, 769, 35 L.Ed.2d 67 (1973) ("wherever an individual may harbor a reasonable 'expectation of privacy' . . . he is entitled to be free from unreasonable governmental intrusion," *quoting Terry v. Ohio, supra*, 392 U.S. at 9, 88 S.Ct. at 1873). *See generally* Note, *The Reasonable Expectation of Privacy—Katz v. United States, A Postscriptum*, 9 Ind.L.Rev. 468 (1976).

■ The court assumes that Judge Nickerson was correct in finding, on the facts presented in *Taborda*, that the defendant there had "preserve[d] as private" his conduct within the apartment into which federal agents gazed through a telescope. The facts adduced at the hearing on the pending motions in this case, however, do ·not support a similar conclusion under the *Katz* standard. Rather, the evidence here established that the defendants engaged in the display of weapons in and around a lighted office area of a gasoline station located on a major public thoroughfare in a commercial district. Their activities were plainly ⸱ visible to passersby, and could be clearly seen by a person across the street, without the use of artificial visual aids.[53] Accordingly, the defendants must be held to have "knowingly exposed to the public" those activities at the gas station which were conducted in the area of the station where they could readily be seen by observers using only their naked eyes. Those activities were not "preserve[d] as private," *Katz v. United States, supra,* 389 U.S. at 351, 88 S.Ct. at 511, and the police did not violate any "privacy upon which [the defendants] justifiably relied," *id.* at 353, 88 S.Ct. at 512, while at the Exxon station. Stated otherwise, in the familiar terms used in the concurring opinion of Justice Harlan in *Katz,* the defendants had no "constitutionally protected reasonable expectation of privacy" when they displayed weapons at the Exxon station. *Katz v. United States, supra,* 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J., concurring). *See United States v. Minton,* 488 F.2d 37, 38 (4th Cir. 1973) (per curiam), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (1974) (viewing unloading of contraband from vehicle with assistance of binoculars did not violate Fourth Amendment); *United States v. Loundmannz,* 472 F.2d 1376, 1379 (D.C.Cir. 1972) (per curiam), *cert. denied,* 410 U.S. 957, 93 S.Ct. 1431, 35 L.Ed.2d 691 (1973) (use of high–powered binoculars to observe street–corner "numbers" game upheld); *United States v. Grimes,* 426 F.2d 706, 708 (5th Cir. 1970) (per curiam) (use of binoculars to observe defendants placing contraband in automobile was not an illegal search).

However, even if the use of the telescope employed by Detective Torento and the intermittent use of a telephoto lens by Officer Duff were not permissible in the absence of prior judicial authorization, the subsequent arrests, searches and seizures would not necessarily be so tainted by such illegality that their fruits would have to be excluded. The Supreme Court has stated that "the exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source' . . . ." *Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), *quoting Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).

Assuming *arguendo* that the use of artificial lenses here was unconstitutional, the fact remains that Officer Duff saw nearly everything which transpired at the Exxon station without the assistance of such lenses. Unlike *Taborda,* there is a factual basis here for the conclusion that the police were able to determine what the defendants were doing without the aid of a telescope or similar device. *Compare United States v. Taborda, supra,* 491 F.Supp. at 51 ("Here, so far as the affidavit reveals, *every fact critical to a showing of probable cause* might

---

**53.** On this point, the court credits not only Officer Duff's testimony that he saw the activities of the defendants at the Exxon station from the surveillance location with his own eyes, but also the testimony of Detective Torento concerning a subsequent visit he made to the vicinity of the Exxon station. Torento testified that when he returned to that area in daylight, he found that from the place where the surveillance van had been parked on the evening of October 3, 1979, he was able to see people moving about inside the office of the station. Tr. 304–05. Torento also testified that it was easier to see inside the office on the evening of October 3, 1979, when the office was illuminated and it was dark outside, than on his subsequent daytime visit. *Id.* The court finds this uncontradicted testimony—and indeed all of the testimony of Officer Duff and Detective Torento, who were the only witnesses at the hearing—to have been highly credible.

have been observed *exclusively* through the telescope") (emphasis added); *id.* at 53. Therefore, even if the use of the telescope and telephoto lens here were improper, this is not a case where the evidence in question "would not have come to light but for the illegal actions of the police." *Wong Sun v. United States, supra,* 371 U.S. at 488, 83 S.Ct. at 417. Rather, the situation would be one in which the officers' knowledge of the defendants' conduct could be traced to "an independent source," *Silverthorne Lumber Co. v. United States, supra,* 251 U.S. at 392, 40 S.Ct. at 183—*i. e.,* Officer Duff's unaided eyesight—untainted by any illegality in the use of the telescope and telephoto lens during the surveillance mission performed hours before the defendants were arrested.

The foregoing analysis of the propriety of the conduct of the police in this case has necessarily followed a somewhat tortuous path. The doctrines which the court has been called upon to apply to the facts presented are intricate and complex; they do not always give clear guidelines to law enforcement officials and the citizens who come in contact with them. Perhaps because these doctrines depend so heavily on the fact patterns of the cases in which they were announced, they are at times difficult to apply to other situations. As the Supreme Court itself has stated, "the decisions of this Court dealing with the constitutionality of warrantless searches, especially when those searches are of vehicles, suggest that this branch of the law is something less than a seamless web." *Cady v. Dombrowski,* 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973).

The elaborate rules governing the proper construction of the Fourth Amendment in cases such as this one are not meant to be applied only by judges and lawyers, who might by training and experience be expected to master such mysteries. Law enforcement agents, too, must use them and are in fact required to make quick judgments, without the luxury of hindsight, on the basis of this body of judicial decisions. This general state of affairs may be subject to criticism. However, in this particular case the conduct of the police not only constituted a reasonable response to their suspicions and observations of possible (and eventually probable) criminal activity involving dangerous weapons; it also satisfied the somewhat labyrinthine rules by which the legality of such police activity must be measured by this court.

### III. Order

On the basis of the findings of fact and conclusions of law set forth above, it is clear that the government has established by a preponderance of evidence that the searches and seizures complained of did not violate the constitutional rights of the defendants.[54] Accordingly, the motions to suppress are denied in all respects.

It is so ordered.

---

**54.** Although the initial burdens of production and persuasion are the movants' to bear, the burdens shift to the government where, as here, the defendants seek to suppress the fruits of warrantless searches. *See United States v. Arboleda,* 633 F.2d 985, 989 (2d Cir. 1980); *United States v. de la Fuente,* 548 F.2d 528, 533 (5th Cir.), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249, 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); *United States v. Bradford,* 496 F.Supp. 366, 372 n. 31 (D.Conn.1980). The requisite level of proof is a preponderance of the evidence adduced at the hearing. *See United States v. Matlock,* 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974).